# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| JODIE MICHELLE WELLS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO. 1:12-CV-00409 |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Jodie Wells appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Wells applied for DIB in May 2009, alleging disability as of August 31, 2008. (Tr. 131-32.) The Commissioner denied her application initially and upon reconsideration, and Wells requested an administrative hearing. (Tr. 70-80.) On July 9, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Bryan Bernstein, at which Wells (who was represented by counsel); Richard Allen, her friend and roommate; and a vocational expert ("VE"), testified. (Tr. 35-67.) On February 23, 2011, the ALJ rendered an unfavorable decision to Wells, concluding

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013. As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 20-29.) The Appeals Council denied her request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3.)

Wells filed a complaint with this Court on November 15, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Wells argues that the ALJ's discounting of the opinion of her treating psychiatrist, Dr. Kalapatapu, is not supported by substantial evidence. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 14-18.)

## II. FACTUAL BACKGROUND[3]

### *A. Background*

At the time of the ALJ's decision, Wells was thirty-nine years old, had obtained her GED, and had past work experience as a production worker, fast food employee, and security guard. (Tr. 28, 42, 131, 158, 165, 168-79.) She alleges that she is disabled due to lumbar degenerative disk disease with spondylosis, chronic obstructive pulmonary disease ("COPD"), history of hepatitis C, obesity, bipolar disorder, post traumatic stress disorder ("PTSD"), and borderline personality disorder. (Opening Br. 2.) Because Wells challenges only the ALJ's discounting of the opinion of her treating psychiatrist, Dr. Kalapatapu, the Court will focus on the evidence pertaining to her mental, rather than physical, limitations.

At the hearing, Wells testified that she last worked two years earlier in housecleaning at New Hope Clubhouse, a mental illness facility, but her position was only temporary and ended

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 604-page administrative record necessary to the decision.

after six months. (Tr. 43-44.) She reported that she wants to work and since New Hope has applied for jobs at factories and fast food restaurants, but has been unsuccessful. (Tr. 44-45.) She could not return to work at McDonald's or Walmart because of her felony convictions. (Tr. 43, 45, 48.) When asked what conditions limit her occupationally, she cited mental illness, COPD, and a back condition that keeps her from lifting heavy items. (Tr. 45-46.)

As to her daily activities, Wells stated that she lives in a trailer with her friend Richard, who takes care of most of the household tasks. (Tr. 49-51.) She tries not to stay home much since she no longer drinks alcohol and gets bored there. (Tr. 49.) Therefore, although she lost her driver's license due to multiple drinking and driving felonies, she drives her scooter to visit friends, volunteer at New Hope, or go shopping. (Tr. 49-51.) She also lies down for an hour once or twice a day. (Tr. 54.) She complained of difficulty with concentration, memory, and completing tasks.[4] (Tr. 55-56.)

### B. *Summary of the Relevant Medical Evidence*

In August 1995, Wells was evaluated by Dr. William Yee, a psychiatrist, at the Bowen Center. (Tr. 280-82.) She told Dr. Yee that she had an unhappy childhood because of abuse and fifteen previous suicide attempts, but no hospitalizations. (Tr. 280-82.) On mental status exam, she demonstrated poverty of thought, psychomotor retardation, and anergy of depression. (Tr. 281.) Although she denied suicidal thoughts during the evaluation, she stated that she had thought about it the previous evening and made an attempt in September 1994. (Tr. 281.) Dr. Yee diagnosed her with dysthymia, polysubstance dependence, and PTSD. (Tr. 282.)

Seven years later, in August of 2002, Wells was seen by Dr. Umamaheswara Kalapatapu,

---

[4] Allen, Wells's friend and roommate, also testified at the hearing, essentially corroborating her testimony. (Tr. 56-58.)

a psychiatrist, for complaints of depression. (Tr. 277-79.) He noted that she had a heavy drug abuse history. (Tr. 277.) On mental status exam, Wells demonstrated fairly goal-directed thought, neutral mood and affect, fair judgment, and good insight. (Tr. 278.) He diagnosed her with bipolar I disorder, most recent episode severe, with psychotic features; and polysubstance abuse, cocaine dependence, partial remission. (Tr. 277.) He assigned her a current Global Assessment of Functioning ("GAF") score of 50 and a highest-past-year GAF of 60.[5] (Tr. 279.)

Two and a half years later, in January 2005, Wells was hospitalized for suicidal ideation and an overdose of Darvocet. (Tr. 273-75.) She reported noncompliance with her psychiatric medicines. (Tr. 276.) She was assigned a diagnosis of depressive disorder, not otherwise specified; opiate dependence; alcohol dependence; and borderline personality disorder. (Tr. 275.)

In February 2005, Dr. Kalapatapu adjusted Wells's medications. (Tr. 260.) The following month, she reported that she was doing well except for some sleep problems. (Tr. 259.) Dr. Kalapatapu saw her two more times in 2005 and once in 2006 after she relapsed and was arrested a fourth time for driving under the influence. (Tr. 253, 255, 257-58.)

Wells was in jail in March 2007 and requested that Dr. Kalapatapu prescribe her Seroquel. (Tr. 250-51.) She saw Dr. Kalapatapu in April 2007 when she was on work release. (Tr. 248.) In May 2007, Dr. Kalapatapu wrote that Wells's mood was irritable, but by June she was doing better, although still depressed and anxious. (Tr. 244, 246.) In July, she continued to

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

have sleep problems, and Dr. Kalapatapu prescribed Elavil (Tr. 242); Wells saw Dr. Kalapatapu again in August 2007. (Tr. 240.) In September, Wells contacted the Bowen Center, reporting that she was incarcerated again for new charges and had been fired from her job. (Tr. 238.) She continued to receive medications in jail in October and November 2007. (Tr. 236-37.)

In April 2008, Dr. Kalapatapu reevaluated Wells, who reported that she had been sober for the past year. (Tr. 268-72.) She complained of insomnia and mood swings. (Tr. 269.) On mental status exam, she had a constricted affect and mood, superficial judgment, and limited insight; otherwise, the exam was unremarkable. (Tr. 270.) He diagnosed her with bipolar I disorder, most recent episode mixed, severe, with psychotic symptoms; generalized anxiety disorder; PTSD; alcohol dependence, in remission; and borderline personality disorder. (Tr. 271.) He rated her current and highest-past-year GAF score at 50. (Tr. 271.)

Wells returned to Dr. Kalapatapu in July 2008, reporting that she had problems but was still working second shift at a fast food restaurant. (Tr. 295.) She missed her next few appointments. (Tr. 293-94.) She returned to Dr. Kalapatapu in December when she ran out of medication. (Tr. 291-92.) In January 2009, Dr. Kalapatapu wrote that she was doing well, but still had mood swings. (Tr. 288.)

Also in January 2009, Kurt Bush, a clinician at the Bowen Center, completed an assessment. (Tr. 264-67.) Wells reported a stable mood and that she was abstaining from substance abuse; she had not experienced major depression or mania in the past year, but did report some social anxiety and occasional auditory hallucinations. (Tr. 264.) She also complained of difficulty concentrating. (Tr. 264.) She reported that she became easily frustrated with work due to interpersonal issues with supervisors and coworkers and difficulty with

5

authority figures. (Tr. 265.) His diagnostic impression was bipolar I disorder, most recent episode mixed severe with psychotic features; polysubstance dependence, in remission; alcohol dependence, in remission; cannabis abuse; generalized anxiety disorder; PTSD; and borderline personality disorder. (Tr. 266.) Mr. Bush wrote that Wells would benefit from vocational rehabilitation. (Tr. 266.)

Wells saw Dr. Kalapatapu several more times in 2009, reporting some anxiety and insomnia. (Tr. 284, 286, 599, 601.) She also missed some appointments that year. (Tr. 604.)

On June 23, 2009, Stefanie Wade, Pys.D., evaluated Wells at the request of Social Security. (Tr. 420-25.) Wells reported that she experienced irritability, racing thoughts, paranoid ideation, recurrent suicidal behaviors, impulsivity in sexual behaviors, substance abuse, and mood instability. (Tr. 423.) Dr. Wade noted signs of schizophrenia or other psychotic disorder as evidenced by Wells's report that she thought people were talking about her; she also noted signs of a mood disorder as indicated by her report of insomnia, poor concentration, reduced appetite, and thoughts of worthlessness and self-harm. (Tr. 423.) Also present were signs of an anxiety disorder, due to Wells's report of nightmares of abuse and feelings of paranoia around men, and a personality disorder, due to Wells's report that she had a diagnosis of borderline personality disorder and experienced poor relationships. (Tr. 423.) On mental status exam, Dr. Wade noted that Wells's mood was anxious and that her affect was appropriate; her concentration, persistence, or pace and insight into her behavior were limited. (Tr. 423.) Dr. Wade diagnosed her with bipolar disorder, not otherwise specified; PTSD, chronic; polysubstance dependence; and borderline personality disorder, and assigned her a current GAF of 58 and a highest-past-year GAF of 60. (Tr. 423.)

6

On July 16, 2009, J. Gange, Ph.D., a state agency psychologist, reviewed Wells's record and completed a psychiatric review technique form. (Tr. 439-52.) He concluded that Wells had a moderate limitation in maintaining concentration, persistence, or pace, and a mild limitation in daily living activities, but no difficulties in maintaining social functioning. (Tr. 449.) In addition, Dr. Gange completed a mental residual functional capacity assessment, indicating that Wells was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and set realistic goals or make plans independently of others, but was not significantly limited in the remaining sixteen mental activity categories. (Tr. 453-54.) Dr. Gange opined that Wells retained the ability to perform simple, repetitive tasks with sobriety on a sustained basis without special considerations. (Tr. 455.) Dr. Gange's opinion was later affirmed by a second state agency psychologist, Joseph Pressner, Ph.D. (Tr. 517.)

In November 2009, Dr. Kalapatapu completed a medical source assessment on Wells's behalf. (Tr. 559-60.) He wrote that she had a "severe" limitation, which was defined as "not able to perform designated tasks or function on regular, reliable, and sustained schedule," in the following mental abilities: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular attendance and punctuality; sustain ordinary routine without special supervision; work in coordination with or proximity to others without distraction; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism

7

from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. (Tr. 559-60.)

Dr. Kalapatapu further indicated that Wells had "moderately-severe" limitations in her ability to respond appropriately to changes in the work setting. She had "moderate" limitations in her ability to remember locations and work like procedures; understand, remember, and carry out very short, simple instructions; maintain socially appropriate behavior; and travel in unfamiliar places and use public transportation. And she had "mild" limitations in her ability to interact with the general public. (Tr. 559-60.) He opined that due to her bipolar disorder, anxiety, and PTSD, together with her physical problems, she would "have trouble maintaining a gainful employment." (Tr. 560.)

In March 2010, Wells saw Dr. Manuel Cervoni for a consultation regarding her insomnia. (Tr. 561-62.) A sleep study showed mild obstructive sleep apnea syndrome, and Dr. Cervoni thought that Wells's insomnia was probably multifactorial. (Tr. 561.) He suspected that some of her insomnia stemmed from poor sleep hygiene and nicotine use, but that a substantial portion of it was connected with her bipolar disorder. (Tr. 561.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

9

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. *The ALJ's Decision*

On February 23, 2011, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 20-29.) He found at step one that Wells had not engaged in substantial gainful activity after her alleged onset date and at step two that she had the following severe impairments: lumbar degenerative disk disease with spondylosis, COPD, history of hepatitis C, obesity, bipolar disorder, PTSD, borderline personality disorder, and polysubstance abuse. (Tr. 22.) But the ALJ determined at step three that Wells's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 22-24.)

Before proceeding to step four, the ALJ determined that Wells had the RFC to perform a restricted range of light work limited to the following conditions:

> This individual is not able to perform work that imposes close regimentation of production. Close regimentation of work activity is a consequence of certain operational demands for functioning within close tolerances or for an unusually

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity "RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

10

> rapid level of productivity. Such work is characterized by close and critical supervision that might be required when there is a high value placed by the employer on the product quality, the raw materials, the equipment employed, or upon coordination with other workers and the pace of production. Close and critical supervision in this context would produce unacceptable distress. This work is different from jobs that allow the employees some independence in determining either the timing of different work activities, or the pace of work. Such flexibility as that in the work structure permits the employee an opportunity to catch up with ordinary productivity, especially when there has been a respite.
>
> This person is also unable to address work that imposes intense contact with the public or strangers. Such work exposes employees to the emotional challenges of strangers who may have a personal response that disturbs sensitive individuals. For example, customers with emergencies or extreme dissatisfaction with service or products can display intense anger or despair that makes contact with them very uncomfortable.
>
> This person would require opportunities to sit or stand while working. Relevant impairments would prevent this person from standing and walking longer than 75% of the 8-hour workday.
>
> This person cannot lift and carry greater than 20 pounds occasionally or 10 pounds frequently. This person cannot engage in prolonged walking or standing, e.g., for longer than 60 minutes.
>
> This person cannot work in atmospheric concentrations of dust, smoke, and chemical fumes, or temperature and humidity extremes that would not be as comfortable as ordinary retail, commercial environments.

(Tr. 24.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Wells was unable to perform any of her past relevant work. (Tr. 28.) The ALJ then concluded at step five that she could perform a significant number of unskilled, light occupations within the economy, including laundry folder, hand packager, and mail clerk. (Tr. 28-29.) Accordingly, Wells's claims for DIB were denied. (Tr. 29.)

## C. *The ALJ's Discounting of Dr. Kalapatapu's Opinion Is Supported by Substantial Evidence*

Wells's sole argument on appeal is that the ALJ improperly discounted the opinion of her

11

treating psychiatrist, Dr. Kalapatapu. But contrary to Wells's assertion, substantial evidence supports the ALJ's consideration of Dr. Kalapatapu's opinion.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, "[a] claimant is not entitled to [disability benefits] simply because his treating physician states that he is 'unable to work' or 'disabled'"; the determination of disability is reserved to the Commissioner. *Clifford*, 227 F.3d at 870; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see* 20 C.F.R. § 404.1527(d)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special

significance." SSR 96-5p; *see Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006); 20 C.F.R. § 404.1527(d)(3). "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ considered Dr. Kalapatapu's medical records, including his November 2009 medical source statement indicating that Wells had "severe" limitations in eleven of twenty mental activity categories. (Tr. 27.) In fact, the ALJ penned two paragraphs discussing Dr. Kalapatapu's treatment records and the "severe" limitations articulated in the medical source statement. (*See* Tr. 25-27.) Ultimately, however, the ALJ rejected Dr. Kalapatapu's opinion:

> The claimant is treated for mental impairments, but Dr. Kalapatapu's opinion is not accorded weight. His opinion is inconsistent with or unsupported by his treatment notes. Other evaluations show moderate impairment that would limit her from stressful work.
>
> . . . .
>
> In a November 2009 medical source statement, Dr. Kalapatapu, the claimant's psychiatrist, stated that the claimant has trouble maintaining gainful employment because of bipolar disorder, anxiety and PTSD along with physical problems. He noted severe problems with understanding and remembering detailed instructions, sustained concentration and persistence, social interaction (accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes), and adaptation (setting realistic goals or making plans independently of others). However, this extreme set of findings is wholly unsupported by notes or objective findings from Bowen Center. Dr. Kalapatapu's opinion is also without substantial support from the other evidence of record, which renders it less persuasive.

(Tr. 25-27 (internal citations omitted).)

Wells first argues that the ALJ erred by not assigning controlling weight to Dr.

13

Kalapatapu's opinion. But a treating physician's opinion is only entitled to controlling weight if it is both well supported by medically acceptable clinical and laboratory diagnostic techniques *and* not inconsistent with other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). Therefore, it cannot be seriously disputed that Dr. Kalapatapu's opinion was, among other things, inconsistent with the opinions of Dr. Gange and Dr. Pressner.

In that regard, Dr. Kalapatapu indicated that Wells had "severe" limitations in eleven of twenty mental activity categories (Tr. 559-60), while Dr. Gange and Dr. Pressner concluded that she was "not significantly limited" in sixteen categories and "moderately limited" in four (Tr. 453-44). The disparity between the opinions is further evidenced in their narrative sections, as Dr. Kalapatapu wrote that Wells would "have trouble" maintaining gainful employment (Tr. 560), while Dr. Gange and Dr. Pressner opined that she "retains the ability to perform simple, repetitive tasks with sobriety on a sustained basis without special considerations" (Tr. 455). Therefore, the ALJ surmised, and correctly so, that Dr. Kalapatapu's opinion was not entitled to controlling weight. (Tr. 23); *see Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004) (explaining that a treating physician's opinion is not entitled to controlling weight where it is inconsistent with other medical source opinions of record).

After concluding that Dr. Kalapatapu's opinion was not entitled to controlling weight, the ALJ was then required to evaluate it in accordance with the factors set forth in 20 C.F.R. § 404.1527(c). Wells argues that the ALJ failed to properly perform this step in that he did not discuss all of the "checklist" factors and state what weight he assigned to the opinion.

But with respect to 20 C.F.R. § 404.1527(c), an ALJ's decision "need only include 'good reasons' for the weight given to the treating source's opinion rather than 'an exhaustive factor-

by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. Mar. 16, 2011)); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (stating that there is no "articulation requirement for each and every factor" and that "ALJs are not required to produce prolix opinions containing checklists from all of the regulations" (emphasis omitted)).

Here, the ALJ proffered two good reasons for discounting Dr. Kalapatapu's opinion. After acknowledging that Dr. Kalapatapu was Wells's treating psychiatrist, 20 C.F.R. § 404.1527(c)(2), (5), the ALJ found that Dr. Kalapatapu's opinion was inconsistent with and unsupported by both his own treatment notes and the other medical source opinions of record, 20 C.F.R. § 404.1527(c)(4). (Tr. 25, 27.) Of course, the more consistent an opinion is with the record as a whole; the more a medical source cites relevant evidence, particularly medical signs and laboratory findings, in support of the opinion; and the better an explanation a source provides for the opinion, the more weight the ALJ will give to that opinion. 20 C.F.R. § 404.1527(c)(3), (4); *see Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").

Wells criticizes these finding by the ALJ, contending first that he failed to provide specific reasons for concluding that Dr. Kalapatapu's opinion lacked supportability with his own treatment notes. But the ALJ's logic on this front is adequately traceable. Dr. Kalapatapu's treatment notes center on medication management (Tr. 464-69) with brief statements such as

15

"easily agitated" (Tr. 285), "doing well overall" (Tr. 288), "feels irritable" (Tr. 289), "no problems with meds" (Tr. 464), "doing well" (Tr. 466), and that her symptoms were "manageable" (Tr. 468). *See Dietz v. Colvin*, No. 2:11-cv-442, 2013 WL 3834764, at *24 (N.D. Ind. July 24, 2013) (discounting the treating doctor's opinion where the objective findings in his notes "were sparse, reported improvement, and did not support the limitations [he] later assigned to [the claimant]"). In fact, Wells does not cite any treatment records that actually support the severity of the limitations penned in Dr. Kalapatapu's medical source statement.

And as to inconsistency, the ALJ observed that other evaluations of record reflected that Wells had a moderate impairment, rather than severe. (Tr. 25.) The ALJ cited to the June 2009 evaluation of Dr. Wade, who observed on mental status exam that Wells was mostly attentive to tasks, was cooperative, and had a "good" interaction during the evaluation. (Tr. 423.) She noted that Wells's mood was anxious but her affect appropriate; her concentration, persistence, or pace and her insight into her behavior were limited. (Tr. 423.) Dr. Wade assessed that Wells's ability to complete simple daily tasks was within normal limits and that if she were given benefits, she could manage them on her own, despite some impulsivity in decision-making (Tr. 424); he then assigned her GAF scores near the top of the "moderate" impairment range (Tr. 425). The ALJ also discussed the assessment completed by Mr. Bush at the Bowen Center in January 2009, noting hat Wells reported that her mood was stable, she did not have major depression or mania within the past year, her memory was good, and she was looking for employment. (Tr. 26.)

Wells contends, however, that the ALJ failed to adequately explain *how* Dr. Wade's and Mr. Bush's opinions were inconsistent with Dr. Kalapatapu's. But "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace

16

the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). Here, the ALJ has done enough; the more moderate findings articulated in Dr. Wade's and Mr. Bush's assessments are easily contrasted with Dr. Kalapatapu's opinion of disabling limitations. *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (unpublished) ("The ALJ did not explicitly weigh every factor while discussing her decision to reject [the claimant's treating physician's] reports, but she did note the lack of medical evidence supporting [his] opinion, and its inconsistency with the rest of the record. This is enough." (internal citations omitted)).

Wells further argues that the ALJ "cherry-picked" Mr. Bush's assessment, emphasizing that Mr. Bush *also* wrote that she reported becoming easily frustrated with work due to interpersonal issues and difficulty with authority figures. But in advancing this nitpick, Wells ignores the limitations that the ALJ incorporated into her RFC to accommodate these reported symptoms, such as limiting her to simple, repetitive tasks and precluding her from work involving close regimentation of production, close and critical supervision, or intense contact with the public. Thus, the ALJ certainly did not ignore Wells's moderate mental health limitations; rather, he simply found Dr. Kalapatapu's description of disabling limitations inconsistent with, and unsupported by, the rest of the record—a finding that is indeed supported by substantial evidence.

In sum, the ALJ's logic is easy to trace—the fact that Dr. Kalapatapu was Wells's treating specialist did not overcome the opinion's inconsistency and lack of supportability. To that end, the ALJ ultimately assigned "significant weight" to the opinion of Dr. Gange and Dr. Pressner and no weight to Dr. Kalapatapu's medical source statement. *See Elder v. Astrue*, 529

17

F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulated [his] reasons—a very deferential standard that we have, in fact, deemed lax." (internal quotation marks and citation omitted)); *see Breamed v. Barnhart*, No. 1:05-cv-581, 2006 WL 3248452, at *12 (S.D. Ind. June 13, 2006) ("An ALJ may discount a treating source's opinion as long as the ALJ provides a reasoned explanation for that decision." (citing *Skarbek*, 390 F.3d at 503)). Of course, "[t]he regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise." *Ottman v. Barnhart*, 306 F. Supp. 2d. 829, 839 (N.D. Ind. 2004); *see Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004); 20 C.F.R. § 404.1527(f)(2)(i) ("State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.").

Therefore, the Court will not accept Wells's plea to merely substitute its judgment for the Commissioner. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence"). Consequently, the Commissioner's final decision will be AFFIRMED.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

18

Clerk is directed to enter a judgment in favor of the Commissioner and against Wells.

SO ORDERED.

Enter for this 26th day of September, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge